1 | Sallie B. Armstrong, Esq. (NSBN 1243)
2 | Jimmy F. Dahu, Esq. (NSBN 17061)
McDONALD CARANO LLP
3 | 100 W. Liberty Street, 10th Floor
Reno, NV  89501
4 | Telephone: (775) 788-2000
sarmstrong@mcdonaldcarano.com
5 | jdahu@mcdonaldcarano.com

6 | *Attorneys for Guardian Fund, LLC*

7

### UNITED STATES BANKRUPTCY COURT

### FOR THE DISTRICT OF NEVADA

| In re | Case No. 23-50177-hlb |
|---|---|

GUARDIAN FUND, LLC,

☒ AFFECTS THIS DEBTOR

☐ AFFECTS GUARDIAN CV1, LLC

☐ AFFECTS GUARDIAN CV2, LLC

☐ AFFECTS ALL DEBTORS

    Debtors.

_____

GUARDIAN FUND, LLC, a Nevada limited liability company,

        Plaintiff,

      v.

ERIC LUSTER, in his capacity as Trustee of the Luster Family Trust, U.D.T. dated January 27, 2006; and DEBRA LUSTER, in her capacity as Trustee of the Luster Family Trust, U.D.T. dated January 27, 2006,

        Defendants.

Case No. 23-50177-hlb
Case No. 23-50233-hlb
**Consolidated Under Case No. BK-23-50177-hlb**

Chapter 11

Jointly Administered with:

| 23-50951-hlb | Guardian CV1, LLC |
|---|---|
| 23-50952-hlb | Guardian CV2, LLC |

**Adversary No.:**

**ADVERSARY COMPLAINT**

Plaintiff, GUARDIAN FUND, LLC ("Guardian"), by and through its counsel, Sallie B. Armstrong, Esq., and Jimmy F. Dahu, Esq., of McDonald Carano LLP,  for its Adversary Complaint against Defendants, ERIC LUSTER and DEBRA LUSTER (collectively, the "Lusters"), in their

McDONALD CARANO
100 WEST LIBERTY STREET, TENTH FLOOR • RENO, NEVADA 89501
PHONE 775.788.2000 • FAX 775.788.2020

capacity as Trustees of the LUSTER FAMILY TRUST, U.D.T. DATED JANUARY 27, 2006 (the "Trust"), states, asserts, and alleges as follows:

### PARTIES

1.    Guardian is and was, at all times mentioned herein, a limited liability company with its principal place of business in the state of Nevada.

2.    Guardian was a chapter 11 debtor in the above-captioned bankruptcy case ("Bankruptcy Case") and is currently a reorganized debtor pursuant to this Court's *Order Confirming Second Amended Joint Plan of Reorganization, As Amended And Modified* [ECF No. 1083][1] ("Confirmation Order").

3.    Based upon information and belief, the Lusters, in their capacities as Trustees of the Trust, are and were, at all relevant times mentioned herein, residents of the state of Nevada, and the Trust was formed under Nevada law.

4.    The Trust purposefully availed itself of conducting business in Nevada with Guardian, a Nevada limited liability company, by borrowing money from Guardian pursuant to a promissory note under which Nevada law applies.

### JURISDICTION AND VENUE

5.    This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. § 157, 28 U.S.C. § 1334, and this Court's Confirmation Order approving the *Second Amended Plan of Reorganization*, as subsequently supplemented and modified [ECF No. 1069; *see also* ECF Nos. 956, 997, 1040, and 1065] ("Second Amended Plan").

6.    This adversary proceeding is brought under 11 U.S.C. §§ 542(a) and (b), Bankruptcy Rule[2] 7001(a), the Confirmation Order, and the Second Amended Plan.

7.    Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

8.    The basis for relief sought here arises from a past due debt owed to Guardian by the Trust arising from default on a promissory note, which was property of Guardian's estate on the

---

[1] All references to "ECF No." refer to the documents filed in the above-captioned jointly administered bankruptcy case available at Case No. 23-50177, unless otherwise noted.

[2] All references to "Bankruptcy Rule" refer to the Federal Rules of Bankruptcy Procedure.

2

date Guardian filed its Bankruptcy Case.

9.     This is a core proceeding pursuant to 28 U.S.C. §§ 157(b)(2)(A), (E), (L), and (O). However, if the Court finds one or all or less than all causes of action are non-core, then Guardian confirms its consent, pursuant to Bankruptcy Rule 7008 and Local Rule 9014.2, to entry of a final order by the Bankruptcy Court.

## GENERAL ALLEGATIONS

### A.     Guardian's Confirmed Plan.

10.     Guardian repeats and realleges the allegations of the preceding paragraphs of this Complaint as though fully set forth herein.

11.     On March 17, 2023, certain petitioning creditors filed against Guardian a Chapter 7 *Involuntary Petition Against a Non-Individual* as Case No. 23-50177 ("Involuntary Case").  *See* ECF No. 1, Case No. 23-50177-hlb.

12.     On April 11, 2023, Guardian filed a Chapter 11 *Voluntary Petition for Non-Individuals Filing for Bankruptcy*, initiating Case No. 23-50233 ("Voluntary Case").  *See* ECF No. 1, Case No. 23-50233.  Pursuant to 11 U.S.C. § 301(b), the commencement of Guardian's Voluntary Case constituted an order for relief under Chapter 11 of the Bankruptcy Code. *See* 11 U.S.C. § 301(b).

13.     On April 17, 2023, Guardian filed a *Stipulation Between Debtor and Petitioning Creditors to Consolidate Involuntary and Voluntary Cases Pursuant to Fed. R. Bankr. P. 1015(a)* in both the Involuntary Case and the Voluntary Case. See ECF No. 17, Case No. 23- 50233; ECF No. 12, Case No. 23-50177.

14.     On April 27, 2023, the Court entered its *Order Approving Stipulation Between Debtor and Petitioning Creditors to Consolidate Involuntary and Voluntary Cases Pursuant to Fed. R. Bankr. P. 1015(a) and Fixing Petition Date and Commencement Date* [ECF No. 15, Case No. 23-50177-hlb; ECF No. 28, Case No. 23-50233-hlb] ("Consolidation Order"). The Consolidation Order consolidated the Involuntary Case together with the Voluntary Case under the first-filed case, 23-50177, and fixed Guardian's Petition Date, as defined under 11 U.S.C. § 101(42), to March 17, 2023 ("Petition Date").

McDONALD CARANO
100 WEST LIBERTY STREET, TENTH FLOOR • RENO, NEVADA 89501
PHONE 775.788.2000 • FAX 775.788.2020

15.     On October 21, 2024, Guardian filed its Second Amended Plan pursuant to which the Debtor retained the right to enforce various litigation claims, including the claims alleged herein against the Trust.

16.     On December 27, 2024, the Court entered its Confirmation Order, pursuant to which it confirmed the Second Amended Plan.

**B.     The Purchase of a Security.**

17.     Guardian repeats and realleges the allegations of the preceding paragraphs of this Complaint as though fully set forth herein.

18.     Guardian and the Trust are parties to a Secured Investment Agreement, dated November 22, 2021 ("Agreement"), a true and correct copy of which is attached hereto as **Exhibit 1**.

19.     The Lusters, in their capacity as Trustees of the Trust, executed the Agreement.

20.     Pursuant to the Agreement, Guardian agreed to provide certain services to assist the Trust with the purchase of certain real property identified on Exhibit A of the Agreement (collectively, the "Real Properties").

21.     Pursuant to the following recital in the Agreement, the Trust had actual knowledge they were purchasing a security:

> **WHEREAS**, this Secured Investment Agreement represents a security that has not been registered under the Securities Act of 1933, as amended, or qualified under applicable state securities laws, and has been offered and sold in reliance on exemptions from the registration requirements of these laws. This Secured Investment Agreement is being entered into by the Secured Investor for investment purposes only and not with a view to distribute or for resale. This Secured Investment Agreement may not be re-offered, resold, mortgaged, pledged, hypothecated or otherwise transferred in the absence of an effective registration statement under the Securities Act of 1933 and the regulations promulgated pursuant thereto (unless exempt therefrom) and compliance with any applicable state securities laws and regulations. Such disclosure shall not limit the rights of the Secured Investor to resell or otherwise transfer fee simple interest in the Secured Investment Property as is more specifically setout pursuant to the terms of this Secured Investment Agreement.

22.     On information and believe, the Lusters, in their capacity as trustees of the Trust, are sophisticated, accredited investors who purchased the security under the Agreement for the purpose of effectuating a like-kind exchange under the Internal Revenue Code (the "1031 Exchange").

4

**C.      The PSA and the 1031 Exchange.**

23.      Guardian repeats and realleges the allegations of the preceding paragraphs of this Complaint as though fully set forth herein.

24.      In a 1031 Exchange, the replacement property's (or properties') purchase price must be equal to or greater than the relinquished property's net selling price.

25.      Pursuant to Section 3.4 of the Agreement, Guardian agreed to "[a]rrange Guardian's sale of the Secured Investment Property to [the Trust] on an arm's length basis under the terms of the purchase and sale agreement … attached hereto as Exhibit C."

26.      Pursuant to Section 4.1 of the Agreement, the Trust agreed to "[p]urchase the Secured Investment Property from … Guardian on an arm's length basis under the terms and conditions of the Purchase Contract."

27.      The Lusters, in their capacity as Trustees of the Trust, executed the Purchase and Sale Agreement attached to the Agreement as Exhibit C ("PSA").

28.      Pursuant to the PSA, the Trust engaged in a good faith, arms-length transaction with Guardian to purchase the four (4) Real Properties identified on Exhibit A of the Agreement for $524,657.00.

29.      The recitals to the PSA discuss the arms-length basis for the sale of such Real Properties, in pertinent part, as follows:

> **WHEREAS**, [the Trust] and [Guardian] entered into a certain Secured Investment Agreement **("Secured Investment Agreement")** on the 22nd day of November, 2021 …;
>
> …
>
> **WHEREAS**, [Guardian] is the owner of certain Real Property (the **"Property"**) more fully described in Exhibit A of the Secured Investment Agreement;
>
> **WHEREAS**, [Guardian] desires to sell the Property to [the Trust] upon the terms and conditions set forth herein;
>
> **WHEREAS**, [the Trust] desire to purchase the Property from [Guardian] upon the terms and conditions set forth herein;
>
> **WHEREAS**, the personal and real property which is to be sold and conveyed by [Guardian] and purchased and accepted by [the Trust] pursuant to this Purchase Contract … consists of (i) the real property described in **Exhibit A** of the Secured Investment Agreement, (ii) all improvements, hereditaments, rights, privileges and easements thereunto belonging and all other rights of [Guardian] relating in any way

McDONALD CARANO
100 WEST LIBERTY STREET, TENTH FLOOR • RENO, NEVADA 89501
PHONE 775.788.2000 • FAX 775.788.2020

5

thereto, and (iii) all appurtenances, desks, furniture, fixtures and security equipment located thereon including, without limitation …, ***but without representation or warranty as to the condition or usability of same.***

(Emphasis added.)

30.     Consistent with the arms-length transaction for the sale of the Real Properties, Section 7.3 of the PSA states:

**7.3    Limitations.**  [Guardian] makes and has made no representation or warranty, express or implied, concerning any portion of the Property, its condition, the use to which it may be put, its suitability for any purpose, any environmental matters, or any other thing or matter directly or indirectly related to the Property.  [The Trust] is responsible for determining that the condition of the Property is satisfactory to [the Trust].  [The Trust] will purchase the Property and accept every portion of the Property in its "as is, where-is" condition without requiring any action, expense, or other thing or matter on the part of [Guardian] to be paid or performed.  Upon acceptance of the deed at Closing, [the Trust] will be conclusively deemed to have accepted the Property in its "as is, where-is" condition.  [Guardian] makes and has made no representation or warranty, express or implied, as to the reliability or accuracy of any information or reports provided to [the Trust] which are or were produced by a third Party, it being expressly understood that verification of the accuracy of such information or reports is the responsibility of [the Trust].  [Guardian] disclaims any warranties with respect to the Property, including any common law implied warranties of fitness for a particular purpose, merchantability, or habitability.

31.     Section 8.7 of the PSA states:

**8.7    Entirety and Amendments.**  ***This Purchase Contract embodies the entire agreement between the Parties and supersedes all prior and contemporaneous agreements and understandings relating to the Property.***  This Purchase Contract may be amended or supplemented only by an instrument in writing executed by both Parties.  The Recitals are true and correct and are incorporated into this Purchase Contract by this reference. (Emphasis added.)

32.     Consistent with the Agreement and the arms-length sale of the Real Properties under the PSA, Guardian and the Trust entered into a "Promissory Note/Fixed Rate Loan" dated November 22, 2021 ("Note"), a true and correct copy of which is attached hereto as **Exhibit 2**.  The Note contains a clerical error showing the total loan amount as $524,657.00, rather than the actual loan amount of $164,473.88 as reflected in Exhibit A to the Note and the Agreement.  The remainder of the Note, however, is accurate in all other respects, including, but not limited to, Section 2(a) requiring monthly interest only payments of $931.11.  Therefore, the Note should be reformed solely to reflect the intended and actual loan amount of $164,473.88 and will be acknowledged hereinafter in the reformed/corrected amount.

33.     The Lusters, in their capacity as Trustees of the Trust, executed the Note.

34.     On information and belief, the Note was a critical component of the 1031 Exchange.

35.     Under the applicable like-kind exchange rules under the Internal Revenue Code, to fully defer capital gains tax in a 1031 Exchange, an investor must replace the debt paid off on the relinquished property with an equal or greater amount of debt on the new property.

36.     An investor can also add new cash to the purchase to offset any shortfall in debt.

37.     The Trust chose not to add new cash, but, rather, took out debt in the form of the Note, which is the reason the Note exists.

38.     In contrast, those investors in Guardian who did not need to place debt on their property for purposes of a 1031 Exchange paid cash.

39.     Because the Trust has not paid Guardian the full amount of the Loan, it is enriching itself to the detriment of Guardian, its creditors, and other interested parties, particularly those interested parties who paid cash for purposes of a 1031 Exchange and, under the Second Amended Plan, are treated in the same manner as the Trust.

40.     Upon information and belief, the Trust also had to execute the Department of the Treasury Form 8824 certifying the fair market value of the like-kind property received for purposes of the 1031 Exchange.

41.     The Trust, as the taxpayer and the buyer in an arms-length transaction, and its Trustees had an independent obligation to provide accurate information on the Department of the Treasury Form 8824 for the 1031 Exchange in order to be able to sign applicable tax returns under penalty of perjury, and, therefore, had a duty to make itself aware of all the relevant facts.

42.     Additionally, principles of equity underlie the entire bankruptcy process, and courts have applied the doctrine of quasi estoppel when a party with knowledge of the relevant facts takes a position inconsistent with its former position which is to the disadvantage of another.

43.     The Trust and its Trustees are estopped from accepting the benefits of the 1031 Exchange, including signing a Note, and then refusing to pay the Note to the detriment and disadvantage of Guardian, its creditors, and other interested parties who paid cash for their properties.

7

44.     The Lusters, in their capacity as trustees of the Trust, are, on information and belief, sophisticated, accredited investors with an independent obligation to provide accurate information to the Department of the Treasury in order to sign the Trust's tax return under penalty of perjury and have no defense to the Note.

**D.      The Promissory Note.**

45.     Guardian repeats and realleges the allegations of the preceding paragraphs of this Complaint as though fully set forth herein.

46.     Page 1 of the Note provides that the Trust shall pay Guardian "the principal sum of ($164,473.88 [corrected]), or so much thereof as may be advanced (the 'Loan'), with interest thereon, all subject to the terms and conditions set forth herein."

47.     Section 2(a) of the Note provides that the Trust shall pay Guardian monthly interest only payments of $931.11 on the first of every month.

48.     Section 2(b) of the Note provides that the Trust "may repay this [N]ote by recording Deed Ownership of the Property(s) to" Guardian, with the principal amount of the Note being "reduced by each such recordation in the amount stated on the Purchase and Sale Agreement (PSA) of the even date."

49.     Section 2(c) of the Note provides that "all indebtedness evidenced by the Note … shall become due upon any acceleration of this Note pursuant to a Default as set forth in this Note."

50.     Section 4 of the Note provides for late charges on any delinquent payments under the Note.

51.     Section 5(a) of the Note provides that "[t]here shall be a 'Default' under this Note if any installment of interest shall not be received by [Guardian] within thirty (30) calendar days after the date such installment is due.  Upon a Default the entire principal amount outstanding hereunder and accrued interest thereon, together with [Guardian's] costs and attorneys' fees incurred in collecting and/or enforcing payment hereof shall, at once become due and payable."

52.     Section 8(b) of the Note states that Nevada law governs.

53.     Guardian has performed its obligations under the Note and is not in default thereof.

54.     The Trust has failed to make monthly interest payments due under the Note since

8

1    April 1, 2023, and is therefore in Default pursuant to Section 5(a) of the Note.

2        55.    Guardian's claim against the Trust continues to increase and aggregates to an amount

3    no less than $195,136.50 as of September 1, 2025.

4                           **FIRST CAUSE OF ACTION**

5                              **(Breach of Contract)**

6        56.    Guardian repeats and realleges the allegations of the preceding paragraphs of this

7    Complaint as though fully set forth herein.

8        57.    The Note constitutes a valid, binding, and enforceable contract between the Trust

9    and Guardian.

10       58.    Guardian has performed its obligations under the Note and is not in default thereof.

11       59.    The Trust has breached the Note, and the Trust's Default under the Note continues

12   by virtue of the Trust having failed to pay Guardian all amounts due and owing thereunder.

13       60.    As a direct and proximate result of the Trust's breach of the Note, Guardian has

14   suffered damages in an amount no less than $195,136.50 as of September 1, 2025, plus other

15   applicable costs and fees, expenses, penalties, and interest as otherwise provided under the Note,

16   applicable law, and/or otherwise proven at trial.

17       61.    It has been necessary for Guardian to retain the services of attorneys to prosecute this

18   action, and Guardian is entitled recover its attorney's fees and costs incurred herein as provided for

19   under the Note.

20                           **SECOND CAUSE OF ACTION**

21              **(Breach of the Implied Covenant of Good Faith and Fair Dealing)**

22       62.    Guardian repeats and realleges the allegations of the preceding paragraphs of this

23   Complaint as though fully set forth herein.

24       63.    The Note constitutes a valid and binding contract between the Trust and Guardian.

25       64.    The Note imposes upon the Trust the duty of good faith and fair dealing, which

26   requires the Trust to refrain from conduct that would prevent Guardian from achieving the benefit

27   under the Note.

28       65.    The Trust breached the covenant of good faith and fair dealing by taking actions

McDONALD CARANO
100 WEST LIBERTY STREET, TENTH FLOOR • RENO, NEVADA 89501
PHONE 775.788.2000 • FAX 775.788.2020

1    inconsistent with the full and prompt satisfaction of the Note.

2        66.    As a direct and proximate result of the Trust's breach of the Note, Guardian has

3    suffered damages in an amount no less than $195,136.50 as of September 1, 2025, plus other

4    applicable fees, expenses, penalties, and interest as otherwise provided under the Note, applicable

5    law, and/or otherwise proven at trial.

6        67.    It has been necessary for Guardian to retain the services of attorneys to prosecute this

7    action, and Guardian is entitled recover its attorney's fees and costs incurred herein as provided for

8    under the Note.

9                        **THIRD CAUSE OF ACTION**

10                           **(Unjust Enrichment)**

11        68.    Guardian repeats and realleges the allegations of the preceding paragraphs of this

12    Complaint as though fully set forth herein.

13        69.    Guardian conferred benefits to the Trust, including, but not limited to, providing a

14    $164,473.88 Loan that allowed the Trust to purchase Real Properties on which they placed debt in

15    order to realize tax advantages under 26 U.S.C. § 1031.

16        70.    The Trust took advantage of the benefits Guardian provided to it, in part by

17    purchasing the Real Properties identified in the Agreement and realizing tax advantages under 26

18    U.S.C. § 1031.

19        71.    The Trust has accepted and retained the benefits of the Loan provided by Guardian.

20        72.    The Trust has not paid Guardian the full amount of the Loan and has consequently

21    been unjustly enriched to the detriment of Guardian and its creditors under circumstances that are

22    inequitable and unjust.

23        73.    Absent payment of the sum due and owing, Guardian and its creditors will be

24    damaged by the Trust's unjust enrichment and may have no adequate remedy at law.

25        74.    As a direct and proximate result of the Trust's failure to repay Guardian, Guardian

26    has suffered damages in an amount no less than $195,136.50 as of September 1, 2025, plus other

27    applicable fees, expenses, penalties, and interest as otherwise provided under applicable law and/or

28    otherwise proven at trial.

McDONALD ⚓ CARANO
100 WEST LIBERTY STREET, TENTH FLOOR ● RENO, NEVADA 89501
PHONE 775.788.2000 ● FAX 775.788.2020

75.     It has been necessary for Guardian to retain the services of attorneys to prosecute this action, and Guardian is entitled recover its attorney's fees and costs incurred herein.

**FOURTH CAUSE OF ACTION**

**(Turnover of Property of the Estate 11 U.S.C. § 542(a) and (b))**

76.     Guardian repeats and realleges the allegations of the preceding paragraphs of this Complaint as though fully set forth herein.

77.     The Note, and all proceeds thereunder, constituted property of Guardian's estate under 11 U.S.C. § 541.

78.     As of the Petition Date, the Trust was indebted to the Guardian estate under the Note.

79.     Pursuant to Section 2(c) of the Note, all amounts due under the Note were confirmed to be accelerated.  Consequently, all amounts due under the Note are "matured, payable on demand, or payable on order" as provided under 11 U.S.C. § 542(b).

80.     Pursuant to 11 U.S.C. § 542(a) and (b), Guardian is entitled to recover from the Trust, and the Trust is required to turnover to Guardian, the amount of $164,473.88 plus interest accruing since November 22, 2021, and late fees for the benefit of Guardian's estate.

81.     It has been necessary for Guardian to retain the services of attorneys to prosecute this action, and Guardian is entitled recover its attorney's fees and costs incurred herein as provided for under the Note.

**PRAYER FOR RELIEF**

**(As to all Claims for Relief)**

WHEREFORE, Guardian prays for relief as follows:

1.     For an award of damages in the amount of the principal balance owed under the Note;

2.     For an award of interest on the principal balance owed under the Note in accordance with the terms of the Note;

3.     For an award of all late fees, penalties, costs and expenses relating to the principal balance owed under the Note;

4.     For an award of costs of suit, reasonable attorneys' fees, and interest incurred herein;

5.     For entry of judgment under 11 U.S.C. § 542(a) and (b) ordering the Trust to deliver

McDONALD ⚖ CARANO
100 WEST LIBERTY STREET, TENTH FLOOR • RENO, NEVADA 89501
PHONE 775.788.2000 • FAX 775.788.2020

11

and pay such damages to Guardian;

  6.  Alternatively, for an award of damages for unjust enrichment; and

  7.  For such other and further relief as this Court may deem just and proper.

Dated this 23rd day of December, 2025.

      McDONALD CARANO LLP

      By: */s/ Sallie B. Armstrong*
      Sallie B. Armstrong, Esq. (NSBN 1243)
      Jimmy F. Dahu, Esq. (NSBN 17061)
      McDONALD CARANO LLP
      100 W. Liberty Street, 10th Floor
      Reno, NV  89501
      Telephone: (775) 788-2000
      sarmstrong@mcdonaldcarano.com
      jdahu@mcdonaldcarano.com

      *Attorneys for Guardian Fund, LLC*

McDONALD CARANO
100 WEST LIBERTY STREET, TENTH FLOOR • RENO, NEVADA 89501
PHONE 775.788.2000 • FAX 775.788.2020

# EXHIBIT 1

## SECURED INVESTMENT AGREEMENT

**THIS SECURED INVESTMENT AGREEMENT** ( "**Secured Investment Agreement**"), effective as of this 22nd day of November , 2021 ("**Effective Date**"), by and between **Guardian Fund, LLC**, a Nevada limited liability company located at 5440 Louie Lane, Suite: 106, Reno, NV 89511 ("**Guardian**"), and Luster Family Trust, U.D.T. dated January 27, 2006 ("**Secured Investor**"), an ☐ individual ☐ limited liability Company ☑ Trust located at 3450 Davis Lane Reno, NV 89511 , hereinafter collectively referred to as the "**Parties**" and individually as the "**Party**".

### WITNESSETH

**WHEREAS**, Secured Investor wishes to acquire Secured Investment income properties that can be leased to residential tenants ("**Secured Investment Properties")** for the purpose of generating passive secured investment property income ("**Secured Investment Property Income**");

**WHEREAS**, Guardian and its affiliates constitute an organization of professional personnel who are experienced and fully qualified to perform various functions with respect to the full lifecycle management of Secured Investment Properties, including the identification, acquisition, renovation, leasing, maintenance, management, and disposition thereof ("**Secured Investment Property Services**");

**WHEREAS,** Secured Investor wishes to purchase a Secured Investment Property ("**Secured Investment Property**") that Guardian has identified in accordance with the terms and conditions of this Secured Investment Agreement;

**WHEREAS,** Guardian recognizes that Secured Investor may wish to purchase the Secured Investment Property under Section 1031 of the United States Internal Revenue Code (26 U.S.C. § 1031) through a qualified intermediary, and under such circumstances Guardian agrees to permit the Secured Investor to assign its rights under Section 10.1 of the Purchase Contract (as subsequently defined herein and attached as Exhibit C) to a qualified intermediary in order to effectuate a like-kind exchange under Section 1031 of the United States Internal Revenue Code (26 U.S.C. § 1031);

**WHEREAS,** this Secured Investment Agreement is subject to the terms of the Guardian Fund, LLC Offering of Participating Membership Units dated June 1, 2020 ("Private Placement Memorandum"); and

**WHEREAS,** this Secured Investment Agreement represents a security that has not been registered under the Securities Act of 1933, as amended, or qualified under applicable state securities laws, and has been offered and sold in reliance on exemptions from the registration requirements of these laws. This Secured Investment Agreement is being entered into by the Secured Investor for investment purposes only and not with a view to distribute or for resale. This Secured Investment Agreement may not be re-offered, resold, mortgaged, pledged, hypothecated or otherwise transferred in the absence of an effective registration statement under the Securities Act of 1933 and

the regulations promulgated pursuant thereto (unless exempt therefrom) and compliance with any applicable state securities laws and regulations. Such disclosure shall not limit the rights of the Secured Investor to resell or otherwise transfer fee simple interest in the Secured Investment Property as is more specifically setout pursuant to the terms of this Secured Investment Agreement.

**NOW, THEREFORE**, in consideration of the premises aforesaid and of the mutual covenants and undertakings hereinafter provided, the Parties hereto agree as follows:

## ARTICLE I
## SECURED INVESTMENT PROPERTY

1.1    The address and legal description of the Secured Investment Property that is covered under this Secured Investment Agreement is more fully described in Exhibit A.

## ARTICLE II
## SCOPE OF SECURED INVESTMENT PROPERTY SERVICES

2.1    Guardian shall oversee all aspects of Secured Investment Property Services as described in Exhibit B for the Secured Investment Property.

## ARTICLE III
## GUARDIAN'S RESPONSIBILITIES

Guardian, shall, either directly or indirectly through Guardian Affiliates, subject to the terms and provisions of this Secured Investment Agreement:

3.1    Appoint one or more individuals who shall be authorized to act on behalf of Guardian and with whom Secured Investor may consult with at reasonable times, and whose instructions, requests and decisions will be acted upon by the Guardian as to all matters pertaining to this Secured Investment Agreement and the performance of the Parties hereunder.

3.2    Acquire the Secured Investment Property through a Guardian Affiliate and use all commercially reasonable efforts to renovate the Secured Investment Property based on the standards and time period as mutually agreed upon by the Parties, except for reasons beyond the Guardian's control.

3.3    Arrange the sale of the Secured Investment Property to Guardian by the Guardian Affiliate.

3.4    Arrange Guardian's sale of the Secured Investment Property to the Secured Investor on an arm's length basis under the terms of the purchase and sale agreement ("**Purchase Contract**") attached hereto as Exhibit C.

3.5    Concurrent with the Party's execution of the Purchase Contract ("**Closing**"), enter into a lease arrangement with the Secured Investor for the Secured Investment

Property ("**Lease**") on an arm's length basis under the terms and conditions attached hereto as Exhibit D.

3.6     On an ongoing basis, during the Term of the Lease, arrange for the oversight, property management and maintenance of the Secured Investment Property by a Guardian Affiliate.

3.7     Upon the need to remove one or more properties from the Lease or the complete expiration, termination of the Lease, in its sole and exclusive discretion Guardian will; evaluate whether or not to exercise the right, but not the obligation to purchase the Secured Investment Property from the Secured Investor under the terms and conditions of repurchase more fully outlined in Article III of the Purchase Contract ("**Repurchase Option**").

## ARTICLE IV
## SECURED INVESTOR'S RESPONSIBILITIES

In recognition of the investment of resources and added value created from the provision of Secured Investment Property Services by Guardian and Guardian Affiliates, and Guardian otherwise making the Secured Investment Property available to Secured Investor, Secured Investor shall at such times as may be required for the successful and expeditious completion of the Secured Investment Agreement:

4.1     Purchase the Secured Investment Property from the Guardian on an arm's length basis under the terms and conditions of the Purchase Contract.

4.2     Enter into a lease arrangement with the Guardian for the Secured Investment Property on an arm's length basis under the terms and conditions under the Lease.

4.3     Remit to Guardian, all sums due for the Secured Investment Property Services provided by Guardian or its affiliates ("Guardian Affiliates"), whether under this Secured Investment Agreement or other agreements with Guardian Affiliates for specific Secured Investment Property Services following Secured Investor's purchase of the Secured Investment Property such as property management or other services as agreed between the Parties from time to time.

4.4     Upon the need to remove one or more properties from the Lease or the complete expiration, termination of the Lease and in the event that Guardian chooses to exercise its option to purchase the Secured Investment Property from the Secured Investor under the terms and conditions of the Repurchase Option, the Secured Investor will sell the Secured Investment Property to the Guardian under the terms and conditions of the Repurchase Option.

## ARTICLE V
## INDEMNIFICATION

5.1     To the fullest extent permitted by law, Secured Investor and Guardian shall indemnify, defend, and hold each other harmless as well as each of its affiliates,

directors, officers, agents, employees, plans, and insurance, from and against any and all suits, actions, damages, loss, liability, or costs (including, without limitation, reasonable attorneys' fees directly related thereto) resulting from, arising out of, or connected with the negligent errors or omissions, willful misconduct of, or breach of any provision of this Secured Investment Agreement by that Party during the performance of the Secured Investment Property Services hereunder.

<h3 style="text-align:center">ARTICLE VI<br>COMPENSATION AND TERMS OF PAYMENT</h3>

The terms of compensation and payment are as follows:

6.1     Secured Investment Property Services.  Guardian shall be responsible for the payment to the Secured Investor of amounts due under the Lease.

6.2     Sales Commission.  In the event that Guardian or a Guardian Affiliate is requested by Secured Investor following Guardian's waiver of its Repurchase Option to act in a brokerage capacity for Secured Investor's sale of the Secured Investment Property, Secured Investor will pay Guardian or such Guardian Affiliate a sales commission equal to the greater of Six (6.0%) Percent or $2,400 of the gross proceeds arising from the sale of the Secured Investment Property to a third party.

<h3 style="text-align:center">ARTICLE VII<br>TERM AND TERMINATION</h3>

7.1     The term of this Secured Investment Agreement **("Term")** shall be co-terminus with the Lease.

<h3 style="text-align:center">ARTICLE VIII<br>INDEPENDENT CONTRACTOR</h3>

8.1     The Parties agree that the Guardian and Guardian Affiliates shall be deemed to be independent contractors with respect to the Secured Investment Property Services to be performed hereunder. Neither Guardian, Guardian Affiliates, nor any of their respective managers or employees shall be deemed to be the servants, employees or agents of Secured Investor.

<h3 style="text-align:center">ARTICLE IX<br>NOTICES</h3>

9.1     All notices, demands, consents, approvals, and requests given by either party to the other hereunder shall be in writing and shall be sent by hand, by overnight courier, or by registered or certified mail, return receipt requested, postage prepaid, to the parties at the following addresses:

To Guardian:

       Guardian Fund, LLC
       5440 Louie Lane
       Suite: 106
       Reno, NV 89511
       Tel: (775) 297-4970
       Email: Investing@hughescapital.com
       Attn: Greg Hughes

With copy to:

       Pino Nicholson PLLC
       99 South New York Avenue
       Winter Park, Florida 32789
       Tel: (407) 206-6511
       Email: ljp@PinoNicholsonLaw.com
       Attn: Laurence J. Pino

To Investor:  Luster Family Trust, U.D.T. dated January 27, 2006
       3450 Davis Lane
       Reno, NV 89511

or to such other address and to the attention of such other person as either party may from time to time designate in writing. Notices shall be effective upon receipt. Refusal to accept delivery shall constitute receipt.

## ARTICLE X
## MISCELLANEOUS

10.1 **Confidentiality**. Notwithstanding any reciprocal non-disclosure Secured Investment Agreement executed between Secured Investor and Guardian, this Secured Investment Agreement constitutes the entire Secured Investment Agreement between the Parties hereto for the Secured Investment Property, and supersedes any oral or written representations, understandings, proposals or communications heretofore entered into by or on account of the Parties and may not be changed, modified or amended except in writing signed by the Parties hereto. In the event of any conflict between this Secured Investment Agreement document and any of the exhibits hereto, the terms of and provisions of this Secured Investment Agreement document shall control. In the event of any conflict among the exhibits, the exhibit of the latest date shall control.

10.2 **Secured Investor Authorization**. Secured Investor represents that its engagement of Guardian to perform the Secured Investment Property Services is not in breach of, or otherwise in violation of, any known contract, restriction, or covenant between Secured Investor and any third party. Secured Investor hereby acknowledges that it will defend Guardian, as prescribed in this Secured Investment Agreement, for

any suits, actions, damages, loss, liability, or costs (including, without limitation, reasonable attorneys' fees directly related thereto) resulting from, arising out of, or connected with any such contract, restriction, or covenant.

10.3  **Governing Law and Venue**.  This Secured Investment Agreement shall be governed by and construed in accordance with the laws of the State of Nevada.  In the event of a dispute regarding this Secured Investment Agreement or the respective rights of the parties hereunder, the parties agree to submit such dispute exclusively to binding arbitration in Washoe County, NV before a single professional arbitrator selected by the parties or, if the parties cannot agree on an arbitrator, appointed by the court.  Any such arbitration shall be commenced within fifteen (15) days of selection of the arbitrator and the discovery rules contained in the Nevada Rules of Civil Procedure shall apply to all such proceedings.  The arbitrator shall order all remedies permitted by law, award attorney's fees and costs to the prevailing party, and require that the entire proceeding, including the existence of the proceeding, be held confidential by the parties, and shall not be disclosed by any party. Any and all orders issued by the arbitrator shall be enforced by a state court of competent jurisdiction located in Washoe County, Nevada.

10.4  **Consequential Damage**.  In no event shall either Party be liable to the other for indirect or consequential damages, including, but not limited to, loss of use, loss of profit or interruption of business, whether arising in contract, tort (including negligence), statute or strict liability.

10.5  **Third Parties**.  This Secured Investment Agreement gives no rights or benefits to anyone other than Secured Investor and Guardian and does not create any third Party beneficiaries to the Secured Investment Agreement.

## ARTICLE XI
## CONFIDENTIALITY AND PROPRIETARY INFORMATION

11.1  **Non-Disclosure.**  Notwithstanding any reciprocal non-disclosure document executed by both Secured Investor and Guardian, the Parties understand that they may work with others to concurrently pursue similar Secured Investment Properties outside of this Secured Investment Agreement. In that event, both Secured Investor and Guardian agree that no information regarding the Secured Investment Property contemplated under this Secured Investment Agreement will be shared with other third Parties unless expressly disclosed and approved in advance, in writing.

11.2  **Intellectual Property.**  Further, Secured Investor represents that its engagement of Guardian to perform the Secured Investment Property Services does not infringe upon, or otherwise violate, any intellectual property right held by any third party.

11.3  **Hold Harmless.**  Both Parties hereby acknowledge that either will defend the other, as prescribed in this Secured Investment Agreement, for any suits, actions, damages, loss, liability, or costs (including, without limitation, reasonable attorneys' fees directly related thereto) resulting from, arising out of, or connected with any such intellectual property rights.

**IN WITNESS WHEREOF**, the Parties hereto have executed this Secured Investment Agreement on the day and year first above written.

SECURED INVESTOR:                         GUARDIAN:

                                          **GUARDIAN FUND, LLC**

*Eric Luster*                             *Steve Sixberry*
329F4D0CC4CE4FE...
By:   Eric Luster                         By:   Steve Sixberry or Greg Hughes
      Authorized Representative           Title:  Authorized Representative

*Debra Luster*
329F4D0CC4CE4FE...
By:   Debra Luster                        Date:
      Authorized Representative
                                          November 22nd, 2021

Date:

      11/22/2021 | 5:00:43 PM PST

**EXHIBIT A**
**SECURED INVESTMENT PROPERTY**

| # | Address | City | State | Zip | County | Type | Sales Price | Internal Loan Amount |
|---|---------|------|-------|-----|--------|------|-------------|----------------------|
| 1 | 1843 Charles Road | East Cleveland | Ohio | 44112 | Cuyahoga | SFR | $100,581.00 | $31,530.98 |
| 2 | 7511 Guthrie Avenue | Cleveland | Ohio | 44102 | Cuyahoga | SFR | $87,997.00 | $27,586.04 |
| 3 | 663 E 94th Street | Cleveland | Ohio | 44108 | Cuyahoga | Duplex | $136,307.00 | $42,730.66 |
| 4 | 6809-6811 Whitney Avenue | Cleveland | Ohio | 44103 | Cuyahoga | Four Plex | $199,772.00 | $62,626.20 |
| | | | | | | **TOTAL SALES PRICE:** | **$524,657.00** | **$164,473.88** |



**EXHIBIT B**
**SCOPE OF SECURED INVESTMENT PROPERTY SERVICES**

Subject to amendment from time to time by the Parties, Secured Investment Property Services shall include:

1) The identification of the Secured Investment Property by a Guardian Affiliate,

2) The acquisition of the Secured Investment Property by a Guardian Affiliate,

3) The renovation of the Secured Investment Property by a Guardian Affiliate,

4) The sale of the Secured Investment Property to Guardian by a Guardian Affiliate,

5) Leasing of the Secured Investment Property to residential tenants by a Guardian Affiliate,

6) Maintaining and managing the Secured Investment Property by a Guardian Affiliate, and

7) The optional repurchase by Guardian, or, upon request of Secured Investor, disposition to a third party of the Secured Investment Property through a Guardian Affiliate.

# EXHIBIT C
# PURCHASE AND SALE AGREEMENT

This PURCHASE AND SALE AGREEMENT ("**Purchase Contract**") dated as of this __22nd__ day of __November_____, __2021__ ("**Effective Date**"), by and between **Guardian Fund, LLC**, a Nevada limited liability company located at 5440 Louie Lane, Suite: 106, Reno, NV 89511 ("**Seller**"),  and   Luster Family Trust, U.D.T. dated January 27, 2006 ("**Buyer**"), an ☐ individual ☐ limited liability Company ☑ trust located at 3450 Davis Lane_____, __Reno, NV 89511_____, hereinafter collectively referred to as the "**Parties**" and individually as the "**Party**".

## WITNESSETH:

**WHEREAS**, Buyer and Seller entered into a certain Secured Investment Agreement ("**Secured Investment Agreement**") on the __22nd__ day of __November_____, __2021__ ("**Secured Investment Agreement Date**");

**WHEREAS**, all defined terms in the Secured Investment Agreement are hereby incorporated by reference;

**WHEREAS,** Seller is the owner of certain Real Property (the "**Property**") more fully described in Exhibit A of the Secured Investment Agreement;

**WHEREAS,** Seller desires to sell the Property to Buyer upon the terms and conditions set forth herein;

**WHEREAS,** Buyer desires to purchase the Property from Seller upon the terms and conditions set forth herein;

**WHEREAS,** the personal and real property which is to be sold and conveyed by Seller and purchased and accepted by Buyer pursuant to this Purchase Contract (all of which will hereinafter collectively be referred to as the "**Property**") consists of (i) the real property described in **Exhibit A** of the Secured Investment Agreement, (ii) all improvements, hereditaments, rights, privileges and easements thereunto belonging and all other rights of Seller relating in any way thereto, and (iii) all appurtenances, desks, furniture, fixtures and security equipment located thereon including, without limitation (collectively the "**Fixtures**"), but without representation or warranty as to the condition or usability of same.

**NOW, THEREFORE,** in consideration of the premises and the mutual covenants hereinafter set forth, Seller hereby agrees to sell, and Buyer hereby agrees to purchase, the Property upon the following terms and conditions.

# ARTICLE I
# PURCHASE PRICE

**1.1    PURCHASE PRICE**. The Purchase Price of the Property shall Property shall be: $ $524,657_____.00) ("**Purchase Price**").

**1.2    Payment of the Purchase Price**. The Purchase Price will be paid by Buyer in U.S. funds within five (5) business days after the Effective Date, as hereinafter defined.

# ARTICLE II
# TERMINATION AND NON-CONSUMMATION

**2.1    Termination.** Notwithstanding anything to the contrary in this Purchase Contract, Buyer may terminate the Purchase Contract by giving written notice of termination to Seller if Buyer determines, in Buyer's sole and absolute discretion, that the Property is not acceptable for any reason

**2.2    Non-Consummation.**  In the event that the Closing, as more fully described in Article 5, is not consummated, the Parties agree that any funds paid to Seller by the Buyer shall be promptly returned to the Buyer by Seller and that the return of Buyer Funds shall be the sole and exclusive remedy available to both Parties.  Furthermore, the Parties agree that in the event of non-consummation, each Party shall indemnify and hold the other Party and their respective successors and assigns, and any partner, or principals (disclosed or undisclosed), from and against any and all liability and damages, and from and against any and all suits, claims, and demands of every kind and nature.

# ARTICLE III
# SELLER REPURCHASE OPTION

**3.1    Seller Repurchase Option.**  The real property described in **Exhibit A** is subject to a Lease Agreement that will be executed between the Parties.  Upon the need to remove one or more properties from the Lease or the complete expiration, termination of the Lease, Seller will have the option, but not the obligation, exercisable upon its sole and unfettered discretion, to repurchase the Secured Investment Property from the Buyer.

Buyer understands and acknowledges that a deed restriction will be placed on each Property with the following terms:

*Deed Restriction*
*Right of First Offer*

**Notice Requirements-** *Before the Owner of Record may sell the Premises to a third party, Owner of Record shall first offer the Premises to Hughes Private Capital following the procedures set forth in this Section. Hughes Private Capital shall have twenty (20) days following written receipt of such offer to respond to Owner of Record with a written offer to purchase. Both notices may be delivered via electronic mail (email) if the parties agree and reply to the notice confirming receipt.*

**Negotiations-** *If Owner of Record does not receive a written offer to purchase within said 20-day period, or if Owner of Record and Hughes Private Capital do not enter into a legally binding, written agreement for the purchase and sale of the Premises within 30 days, Owner of record shall be free to enter into an agreement with a third party at terms no more favorable to the third party than Hughes Private Capital offered to Owner of Record.*

**Expiration-** *If Owner of Record does not complete the sale of the Premises with a third party within 90 days from the date Owner of Record first offered the Premises to Hughes Private Capital, Owner of record's right to sell the Premises to a third party shall expire and the procedure described shall be applicable again. Upon each repetition of this procedure, notice shall once again be due. Deed restriction expires and will be released after the next successful deed transfer to new ownership.*

**3.2    Waiver Required.** Seller must waive this right in writing before Buyer may offer the Property for sale to any third parties.

**3.3    Prepaid Appreciation.** Buyer understands and acknowledges there is 1% annual prepaid appreciation within the Fixed Rent payment under the Lease. If a future sale is executed using the Repurchase Option that is above the price paid under this PSA, the sale price will be reduced by the accumulated prepaid appreciation. If Seller waives its right to Repurchase and a sale is executed to an approved third party, Buyer understands and acknowledges they must reimburse Seller the accumulated prepaid appreciation.

**3.4    Insurance Claims.** If during the term of the Lease an insurance claim is paid out to Buyer in an amount equal to or above their purchase price then the property will be removed from the Lease and the lease payment will be adjusted appropriately. If any insurance claim is paid out to Buyer in an amount that is less than the Purchase Price, then the value of the Property for purposes of the Repurchase Option will be reduced by the amount paid out to the Buyer. Similarly, if all or substantially all of the Property shall be taken for any public or quasi-public purpose by any lawful power or authority by the exercise of the right of condemnation or eminent domain, any lump sum award received by Buyer as compensation shall reduce the Repurchase Option and Lease by that amount.

**ARTICLE IV**
**RISK OF LOSS**

**4.1    Property**. Prior to closing, Seller may not take or permit any action without the consent of Buyer (other than actions by Buyer or Seller authorized under this Purchase Contract, actions required by governmental authorities, or actions otherwise beyond the control of Seller) that would in any material, adverse respect modify any exceptions to title set forth in the Title Commitment, alter the condition or zoning of the Property, or impair Buyer's ability to use the Property for the Intended Use.

**4.2    Damage**. Seller will bear the entire risk of loss of the Property occurring prior to the Closing. In the event of material damage to the Property prior to closing by fire, storm, or other casualty, Buyer will have the option, in Buyer's sole and absolute discretion, either to (a) accept title to the Property in its "as-is, where-is" damaged condition, or (b) accept a replacement property of equal or greater value.

**4.3    Condemnation.** If, prior to the Closing, any portion of the Property is taken by eminent domain, then Buyer will have the option, in Buyer's sole and absolute discretion, either to (a) accept a replacement property of equal or greater value, or (b) proceed with the Closing and acquire the Property as affected by such taking, together with all compensation and awards therefor.. If Buyer elects to proceed with the Closing, Buyer will not be entitled to any reduction of the Purchase Price, and Seller will deliver all such condemnation proceeds, or assign the right to receive same, to Buyer at Closing. Seller shall promptly notify Buyer of any actual or threatened condemnation affecting the Property.

**ARTICLE V**
**CLOSING**

**5.1    Closing.** The closing of this transaction ("**Closing**") shall be effective when this Purchase Contract, the Lease, and other standard closing documents have been signed by both parties and funds have been received by Seller.

**5.2    Deliverables at Closing**.  At Closing, the following shall be delivered by Seller and the Buyer as appropriate:

**A.    Purchase Price.** The Purchase Price, crediting any amounts paid to Seller prior to the Closing, plus or minus applicable adjustments, shall be disbursed to Seller by the Buyer, or if applicable, by an escrow agent or a qualified intermediary under Section 1031 of the United States Internal Revenue Code (26 U.S.C. § 1031).

**B.    Title Insurance.**  An ALTA owner's title insurance policy, the cost of which shall be governed by Article 6.2 herein below.

**C.      Other Documents.** Such Other Documents, executed by Buyer and Seller, as may be reasonably required to consummate the transaction contemplated by this Purchase Contract.

**D.      Possession.** Seller shall deliver possession of the Property to Buyer at the Closing.

## ARTICLE VI
## PRORATIONS AND EXPENSES

**6.1      Taxes and Assessments**. There will be no splitting, allocation, or proration of Property expenses.  All Property expenses shall be the responsibility of Seller unless and until the Lease is terminated.

**6.2      Closing Expenses.** Buyer shall pay all closing costs, including without limitation the cost of the Title Commitment and owner's title insurance policy (including related title service charges required under any state insurance regulations), any real estate brokerage fees if applicable, the cost of documentary tax on the Deed, (commonly known as Deed Stamps), and recording of the Deed, and the state of real estate transfer tax, if applicable, any additional costs incurred by either Party, the cost of any governmental approvals, the cost of Buyer's due diligence activities, Buyer's attorneys' fees, and costs incurred in connection with any mortgage loan procured by Seller or Buyer.

**6.3      No Commissions Due.**  Each of Seller and Buyer warrants to the other that no commissions are payable or due to any broker or finder in connection with this Purchase Contract or the transaction contemplated herein.  Each of Seller and Buyer agrees to indemnify, defend and hold the other harmless from and against any commissions or fees or claims for commissions or fees arising under the indemnifying party, which indemnification will expressly survive the termination of this Purchase Contract and the closing of the sale and purchase of the Property contemplated by this Purchase Contract. The representations, warranties, and indemnification set forth in this Paragraph will survive the closing hereunder.

## ARTICLE VII
## REPRESENTATATIONS AND WARRANTIES

**7.1      Seller's Representations and Warranties.**  As a material inducement to Buyer to execute this Purchase Contract and consummate the purchase of the Property, Seller represents and warrants to Buyer that Seller has been duly organized and is validly existing as a limited liability company or corporation, as applicable, under the laws of the state of Nevada. Seller has the full right and authority, and has obtained any and all consents required therefor, to enter into this Purchase Contract and to consummate the sale of the Property. The person signing below on behalf of Seller is duly authorized to execute this Purchase Contract and to bind Seller. This Purchase Contract and all of the documents to be delivered by Seller at the Closing have been and will be authorized

and properly executed and delivered by Seller and are, and will constitute, the valid and binding obligations of Seller.

**7.2    Buyer's Representations and Warranties.**   Buyer hereby warrants they are purchasing the Property for their own account and not with a view towards resale.

**7.3    Limitations.** Seller makes and has made no representation or warranty, express or implied, concerning any portion of the Property, its condition, the use to which it may be put, its suitability for any purpose, any environmental matters, or any other thing or matter directly or indirectly related to the Property. Buyer is responsible for determining that the condition of the Property is satisfactory to Buyer. Buyer will purchase the Property and accept every portion of the Property in its "as is, where-is" condition without requiring any action, expense, or other thing or matter on the part of Seller to be paid or performed. Upon acceptance of the deed at Closing, Buyer will be conclusively deemed to have accepted the Property in its "as is, where-is" condition. Seller makes and has made no representation or warranty, express or implied, as to the reliability or accuracy of any information or reports provided to Buyer which are or were produced by a third Party, it being expressly understood that verification of the accuracy of such information or reports is the responsibility of Buyer. Seller disclaims any warranties with respect to the Property, including any common law implied warranties of fitness for a particular purpose, merchantability, or habitability.

## ARTICLE VIII
## MISCELLANEOUS

**8.1    Assignment.** Seller may assign its rights and obligations under this Purchase Contract to a Seller Affiliate.  Buyer may assign its rights under this Purchase Contract to a qualified intermediary in order to effectuate a like-kind exchange under Section 1031 of the Internal Revenue Code.  Seller agrees to cooperate with Buyer and the intermediary as reasonably requested; however, Seller will not be required to incur any liability or undertake any additional responsibilities as a result of the exchange.  Seller understands that the qualified intermediary will not be assuming Buyer's obligations; accordingly, Seller will look solely to Buyer for the performance of Buyer's obligations and will release the qualified intermediary from responsibility for any breach of Buyer's obligations under this Purchase Contract.

**8.2    Headings.** The article and section headings of this Purchase Contract are for convenience only and in no way limit or enlarge the scope or meaning of the language hereof.

**8.3    Invalidity and Waiver.** If any portion of this Purchase Contract is held invalid or inoperative, then so far as is reasonable the remainder of this Purchase Contract will be deemed valid and operative, and effect will be given to the intent manifested by the portion held invalid or inoperative. Except to the extent provided otherwise herein, the failure by either Party to enforce against the other any term or provision of this Purchase Contract

will not constitute a waiver of such Party's right to enforce against the other Party the same or any other such term or provision.

**8.4    Governing Law.** This Purchase Contract will, in all respects, be governed, construed, applied, and enforced in accordance with the laws of the state of Nevada.

**8.5    Venue.** Any legal proceeding to construe or enforce this Purchase Contract must be brought in the appropriate Court venue in and for Washoe County, Nevada. Buyer and Seller submit to the jurisdiction of this court.

**8.6    No Third-Party Beneficiary.** This Purchase Contract is not intended to give or confer any benefits, rights, privileges, claims, actions, or remedies to any person or entity as a third-Party beneficiary or otherwise.

**8.7    Entirety and Amendments.** This Purchase Contract embodies the entire agreement between the Parties and supersedes all prior and contemporaneous agreements and understandings relating to the Property. This Purchase Contract may be amended or supplemented only by an instrument in writing executed by both Parties. The Recitals are true and correct and are incorporated into this Purchase Contract by this reference.

**8.8    Notices.** All notices, demands, consents, approvals, and requests given by either party to the other hereunder shall be in writing and shall be sent by hand, by overnight courier, or by registered or certified mail, return receipt requested, postage prepaid, to the parties at the following addresses:

To Seller:

> Guardian Fund, LLC
> 5440 Louie Lane
> Suite: 106
> Reno, NV 89511
> Tel: (775) 297-4970
> Email: Investing@hughescapital.com
> Attn: Greg Hughes

With copy to:

> Pino Nicholson PLLC
> 99 South New York Avenue
> Winter Park, Florida 32789
> Tel: (407) 206-6511
> Email: ljp@PinoNicholsonLaw.com
> Attn: Laurence J. Pino

To Buyer:     Luster Family Trust, U.D.T. dated January 27, 2006

3450 Davis Lane

Reno, NV 89511

or to such other address and to the attention of such other person as either party may from time to time designate in writing. Notices shall be effective upon receipt. Refusal to accept delivery shall constitute receipt.

**8.9     Indemnification.** Any obligation contained herein to indemnify a Party includes indemnification against any attorney's fees incurred by such Party in connection with trial or appellate proceedings.

**8.10    Execution in Counterparts.** This Purchase Contract may contain more than one counterpart of the signature page, and this Purchase Contract may be executed by the affixing of the Parties' signatures to one or more of such counterpart signature pages, All such counterpart signature pages will be read as though one, and they will have the same force and effect as though all the signatories have signed a single signature page.

**8.11    Documents.** If this Purchase Contract is terminated for any reason other than the default of Seller, Buyer shall deliver to Seller copies of any reports, surveys, and studies related to the Property created by, or on behalf of, Buyer prior to the date of termination.

**8.12    Time.** Time is of the essence in the performance of this Purchase Contract. Any time period ending on a Saturday, Sunday, or national legal holiday will be extended until 5:00 p.m. of the next business day.

**8.13    Construction of Purchase Contract.** The Parties acknowledge that the Parties and their counsel have participated in the drafting of this Purchase Contract and that the normal rule of construction to the effect that any ambiguities are to be resolved against the drafting Party will not be employed in the interpretation of this Purchase Contract or any exhibits or amendments hereto. Whenever required by the context, the singular number includes the plural, the plural number includes the singular, and the use of any gender include all genders. When the word "including" (or some derivation thereof, such as "includes") is used in this Purchase Contract to refer to something that, in that context, may be part of a larger group of similar items, the reference is without limitation, and it should be interpreted as if followed by "but not limited to," "without limitation," or appropriate equivalent language for the context.

**8.14    Facsimiles.** The Parties may evidence their acceptance of this Purchase Contract by facsimile or electronic transmission of a copy of this Purchase Contract bearing the respective Party's signature, and such facsimile or electronic copy will be binding for all purposes as fully as a copy bearing the original signature of such Party.

**8.15    Confidentiality.** Buyer and Seller agree to maintain, and to cause their respective employees, brokers, counsel and other consultants, advisors and agents to maintain, the highest degree of confidentiality with respect to the subject matter of this Purchase Contract.   Buyer hereby confirms, for itself and its financial, legal, environmental,

engineering, and other consultants to be utilized by Buyer in connection with Buyer's inspection of the Property, that Buyer shall keep all matters regarding the Property (including, without limitation, the Inspection Items) private and confidential, and shall not disclose any such information to any party not assisting Buyer in Buyer's investigations of the Property. Additionally, prior to delivery of all or any portion of the Inspection Items to any consultant, Buyer shall receive the assurance and confirmation of said consultant that said consultant will likewise keep matters set forth within the Inspection Items private and confidential, and will not disclose the substance of such Inspection Items to any other party not involved in investigation of proposed acquisition of the Property for Buyer.

       IN WITNESS, HEREOF, the parties have caused this Purchase Contract to be executed as of the Effective Date first above written by their duly authorized officers.

**BUYER**

Luster Family Trust, U.D.T. dated January 27, 2006

Eric Luster

**Title:**

**Signature:** _Eric Luster_
329F4D0CC4CE4FE...

**Date Signed:** 11/22/2021 | 5:01:54 PM PST

Debra Luster

**Title:**

**Signature:** _Debra Luster_
329F4D0CC4CE4FE...

**Date Signed:** 11/22/2021 | 5:00:43 PM PST

**GUARDIAN FUND, LLC**

**Name:** Steve Sixberry or Greg Hughes

**Title:** Managing Member

**Signature:** _Steve Sixberry_

**Date Signed:** November 22nd, 2021

# EXHIBIT D
## LEASE AGREEMENT

    This LEASE AGREEMENT ("**Lease**"), is entered into as of this <u>22nd</u> day of <u>November</u>, <u>2021</u> by and between <u>Luster Family Trust, U.D.T. dated January 27, 2006</u> ☐ AS INDIVIDUAL(S) ☑ AS TRUSTEE(S) ☐ AS MEMBER(S) of <u>Luster Family Trust, U.D.T. dated January 27, 2006</u> (together with its successors and assigns, "**Lessor**"), and **Guardian Fund, LLC**, a Nevada limited liability company (together with its successors and assigns, "**Lessee**").

## WITNESSETH:

    **WHEREAS**, Secured Investor and Guardian entered into a certain Secured Investment Agreement ("**Secured Investment Agreement**") on the <u>22nd</u> day of <u>November</u>, <u>2021</u> ("**Secured Investment Agreement Date**");

    **WHEREAS**, all defined terms in the Secured Investment Agreement are hereby incorporated by reference;

    **WHEREAS,** Secured Investor is the owner of certain Real Property (the **Property**") more fully described in Exhibit A of the Secured Investment Agreement, and;

    **WHEREAS,** Lessor hereby leases to Lessee the Property, together with any improvement to the Property ("**Improvements**").

    TOGETHER WITH the rights and appurtenances pertaining to the Property (the Property, including the Improvements, are referred to as the "**Demised Premises**").

    SUBJECT TO the Permitted Exceptions (as later defined). The lease of the Demised Premises includes, without limitation, Lessee's right to use the furniture, fixtures, equipment and other personal property, if any, owned by Lessor and located in, on or about the Demised Premises "Personalty", and Lessee hereby waives any right, title or interest to the ownership thereof, whether pursuant to statute or common law.

    NOW, THEREFORE, the parties agree as follows:

**1.**    **Term**. The term ("**Term**") of this Lease shall commence on the Effective Date and expire on the first anniversary of the Effective Date ("**Expiration Date**") unless sooner terminated as provided in this Lease. All terms, provisions and conditions of this Lease shall be effective as of the Effective Date.

        (A)   <u>Automatic Renewal</u>. This Lease shall automatically renew for additional one-year terms (each, a "**Renewal Term**") upon the expiration of the initial Term and any Renewal Terms, unless either party provides written notice of its intent to terminate the Lease not less than 30 days prior to the applicable term's expiration.

(B)    <u>Lessor's Right to Early Termination</u>. The Lessor shall have the right to terminate this Lease at any time, for any reason or no reason at all, upon delivering a minimum 30 days written notice to the Lessee.

(C)    <u>Lessee's Right to Early Termination</u>. The Lessee shall have the right to terminate this Lease at any time, for any reason or no reason at all, upon delivering a minimum 90 days written notice to Lessor.

## 2.    **Fixed Rent**.

(A)    Lessee agrees to pay Lessor without any setoff or deduction whatsoever, except as otherwise specifically provided under this Lease, a fixed monthly rental payment of $ $2,970.15    , payable at monthly, quarterly or bi-annual intervals at the option of Lessee ("**Fixed Rent**"). If paid monthly, Fixed Rent shall be due no later than the 5th day of each month with the first month being a pro rata portion from the effective date. If this Lease is terminated prior to the Expiration Date, then Lessee agrees to pay Lessor the pro rata portion of the monthly installment of the Fixed Rent through and including the date of such early termination.

(B)    Lessee reserves the right to adjust the Fixed Rent to market conditions no more than two times per year with a 30-day notice.

(C)    Any installment or installments of Fixed Rent, additional rent, and/or other sums coming due to Lessor under the provisions of this Lease which are not paid when due and remain unpaid for 30 days following written notice and demand from Lessor, shall bear interest at the Default Rate of 5% simple annual interest per annum.

(D)    Commencing on the Effective Date and at all times during the Term, Lessee shall pay or shall cause any and all Sublessees to pay for all public utilities, including all charges for electricity, water, fuel oil, gas and telephone, incurred in connection with the occupancy, maintenance and/or operation of the Demised Premises, and any and all other costs and expenses incurred in connection with the occupancy, maintenance and/or operation of the Demised Premises, except those expenses properly borne by the Lessor under the laws of the jurisdiction to which the demised premises is subject.

## 3.    **Use of Demised Premises**. Lessee covenants that it shall use the Demised Premises for any lawful purpose and for no other purpose. Anything herein contained to the contrary notwithstanding, Lessee shall not use or permit the use of the Demised Premises or any part thereof for any unlawful or illegal purposes or in violation of any certificate of occupancy, or for any extra-hazardous purpose or in such manner as to create or constitute a nuisance of any kind.

4.      **Payment of Taxes**.

(A)    All Taxes assessed for the Term shall be paid by the Lessee. As used herein, the term "**Taxes**" shall mean all taxes, assessments, water charges and sewer rents, rates and charges, transit taxes, charges for public utilities, excises, levies, license and permit fees and other governmental charges, general and special, ordinary and extraordinary, foreseen and unforeseen, of any kind and nature whatsoever which at any time prior to or during the term of this Lease may be assessed, levied, confirmed, imposed upon or become a lien on the Demised Premises or the Property, or any part thereof, or for any use or occupation of the Demised Premises, and such franchises as may be appurtenant to the use of the Demised Premises, this transaction or any document to which Lessee is a party. The term "**Taxes**" as used herein shall not include any franchise, excise, corporate, inheritance, succession, capital levy or transfer tax of Lessor, or any income, profits or revenue tax upon the income of Lessor.

(B)    As additional rent, Lessee shall pay or shall cause to be paid, as the same shall become due and payable, all Taxes which are assessed and are, or become, a lien during the term of this Lease; *provided*, *however*, that with respect to any bill or statement for Taxes issued by any taxing authority directly to Lessor, Lessee shall have no obligation to pay such Taxes, or interest or penalties accrued with respect thereto, until 30 business days shall have expired following Lessee's receipt of such bill or statement. Lessee may pay or shall cause to be paid any Taxes in installments, if payment may be so made, without fine or penalty. Notwithstanding the foregoing, in the event the holder ("**Fee Mortgagee**") of any mortgage which affects Lessor's interest in the Demised Premises or any portion thereof (each such mortgage, a "**Fee Mortgage**") requires that Taxes be paid in advance of their due date, or in installments in advance of the due date to be held in escrow by the Fee Mortgagee, Lessee hereby agrees to pay or shall cause to be paid Taxes as required by the Fee Mortgagee.

(C)    Lessor hereby designates Lessee to act on its behalf and, during the Term of this Lease, assigns to Lessee Lessor's rights and interest: (i) to complete, terminate or settle any appeal proceedings pending on the Effective Date with respect to Property tax assessments of the Demised Premises for periods prior to the Effective Date, (ii) to determine the need to initiate an appeal of any Property tax assessment of the Demised Premises with respect to periods prior to or after the Effective Date, and to complete, terminate or settle any such appeals, and (iii) to engage legal counsel in connection with the foregoing, *provided*, *however*, that any refunds or settlement monies resulting from such appeals shall be applied as follows subject to the terms of any Fee Mortgage: (1) first, to the payment of all attorneys' fees and costs attendant to such appeals, (2) second, to any Sublessees to the extent such Sublessees are entitled to a portion of such refunds or monies under their respective subleases and (3) third, to Lessee. Lessee shall pay all costs, including attorneys' fees and costs, attendant to such appeals (to the extent not covered by the application of any refunds or settlement monies) and Lessor shall have no obligation to pay the same.

6.      **Repairs**. Lessee will (i) make all necessary repairs and replacements to the Demised Premises, whether ordinary or extraordinary, foreseen or unforeseen, structural or non-structural, during the term of this Lease, (ii) keep the same in substantially the same condition and repair as when received and (iii) at the expiration or sooner termination of this Lease, return the Demised Premises to Lessor in substantially the same condition and repair as when received, ordinary wear and tear and condemnation losses excepted. In furtherance and not in limitation of the foregoing, but subject to the provisions of Section 10, Lessee agrees to perform any necessary repairs, replacements and restorations to the Demised Premises as and when the same are necessary (in Lessee's sole judgment).   The Lessee is not responsible for capital improvements.

7.      **Compliance with Laws**. Lessee shall comply with all statutes and ordinances applicable to the Demised Premises. Lessee shall pay all costs and expenses incidental to such compliance and will indemnify and save Lessor harmless from and against all expenses, costs and damages of every nature by reason of any notice, orders, violations or penalties filed against or imposed upon the Demised Premises or against Lessor as owner thereof, because of the failure of Lessee to comply with this covenant. Lessee shall have the right to contest or review any such order by legal proceedings or in such manner as Lessee may deem advisable and may have any such order cancelled, removed or revoked, without actual compliance therewith.

8.      **Indemnification**. Lessee shall indemnify and hold harmless Lessor, each Fee Mortgagee and their respective successors and assigns, and any partner, or principal (disclosed or undisclosed) of Lessor from and against any and all liability and damages, and from and against any and all suits, claims, and demands of every kind and nature, including reasonable counsel fees and expenses, by or on behalf of any person, firm, association or corporation to the extent arising out of or based upon the negligence or willful misconduct of Lessee or any agent, employee or contractor of Lessee, or any accident, injury or damage, however occurring, which shall or may happen during the term of this Lease, on or about the Demised Premises. Nothing herein shall require Lessee to indemnify Lessor, any Fee Mortgagee, or any parties or principal (disclosed or undisclosed) of Lessor based upon the following (each, an "**Excepted Item**"): (A) any accident, injury or damage on or about the Demised Premises, arising out of the gross negligence or willful misconduct of Lessor or any agent of Lessor; or (B) any misrepresentation made by Lessor herein. Lessee, at its expense, shall have the right to defend with counsel of its own choice any legal proceeding commenced or threatened against Lessor or Lessee, in connection with which a claim for indemnification may be asserted by Lessor. Lessor shall indemnify and save harmless Lessee, its officers, directors, shareholders, successors, permitted assigns, and any guarantor of Lessee's obligations hereunder from and against any liability and damages, and from and against any and all suits, claims and demands of every kind and nature, including reasonable counsel fees and expenses, to the extent arising out of or based upon any Excepted Item. Lessor, at its expense, shall have the right to defend with counsel of its own choice any legal proceeding commenced or threatened against Lessor or Lessee, in connection with which a claim for indemnification may be asserted by Lessee on account of any Excepted

Item. Lessor shall not be required to furnish any services or facilities or to make any repairs or alterations of any nature in or to the Demised Premises, Lessee hereby assuming the full and exclusive control thereof and responsibility for the condition, operation, repair, replacement, maintenance and management of the Demised Premises.

9.    **Insurance**.

(A)    Investors with Leverage. Lessor shall be responsible for maintaining both property and liability insurance coverage on all leased properties of satisfactory amounts such that no liability shall fall to lessee. Lessor shall maintain insurance coverage through escrow with Lessor's Lender.

(B)    Investors without Leverage. Lessor's name shall be added to Lessee's existing liability insurance policy for Lessor's assets. This insurance coverage will not require any payment on the part of the Lessor, or any reimbursement on the part of the Lessee.

10.    **Damage or Destruction**.  If during the Term of this Lease any portion of the Demised Premises or the Improvements are damaged or destroyed by fire or other casualty, Lessee shall be liable for the loss, repair or replacement of the Demised Premises.

11.    **Condemnation**. All compensation awarded or paid upon such a total or partial taking of the Demised Premises shall belong to and be the property of Lessor. Nothing contained herein shall be construed to preclude Lessee from prosecuting any claim directly against the condemning authority in such condemnation proceedings for loss of business, depreciation or damage to and/or cost of removal or the value of stock and/or trade fixtures, furniture and other personal property belonging to Lessee; *provided, however*, that no such claim or award shall diminish or otherwise adversely affect Lessor's claim or award, nor any claim or award of any Fee Mortgagee. If any award pursuant to a taking shall have a "loss of use" component specifically allocated, such component of the award shall be paid to Lessee.

12.    **Lessor's Right to Perform Lessee's Covenants**. If Lessee shall at any time fail to make any payment or perform any act on its part to be made or performed hereunder, then Lessor, without waiving or releasing Lessee from any obligation of Lessee contained in this Lease, may at its option pay any sum or perform any act on Lessee's part to be paid or performed as provided herein, and may enter upon the Demised Premises for any purpose and take any action thereon as may be necessary to cure such failure. The amount of any payment made, or expense incurred by Lessor in connection with the foregoing, with interest thereon at the Default Rate from the date of payment, shall constitute additional rent (hereinafter defined as "**Additional Rent**") and shall be paid by Lessee to Lessor on demand. Notwithstanding the foregoing, Lessor may not, except in the case of an emergency, exercise any rights pursuant to this Section 12, except upon 30 days' prior written notice to Lessee. In the event Lessee fails to pay Taxes or any other sum which Lessee is required by the terms of this Lease to pay, and Lessor,

in its absolute discretion elects to pay such sum on behalf of Lessee, Lessee shall pay to Lessor, as Additional Rent hereunder, within 30 days of demand therefor, the amount of such payment, together with interest at the Default Rate, from the date of such payment by Lessor until the date Lessee pays such sums to Lessor.

**13.    Discharge of Liens**.

(A)    Lessee shall not create, permit to be created or to remain, and covenants to discharge any lien, encumbrance or charge upon the Demised Premises or any part thereof or the income therefrom having any priority or preference over this Lease or ranking on a parity with the estate, right and interest of Lessor in the Demised Premises or the Property, or any part thereof, or the income therefrom, and Lessee will not suffer any matter or thing whereby the estate, right and interest of Lessor might be impaired except as expressly provided in this Lease. Except for any Fee Mortgage, Lessor shall not create, permit to be created or to remain, and covenants to discharge any lien, encumbrance or charge upon the Property or the Improvements or any part thereof or the income therefrom, and Lessor will not suffer any matter or thing whereby the estate, right and interest of Lessee might be impaired except as expressly provided in this Lease.

(B)    If, as a result of action or inaction by Lessee, any mechanic's, laborer's or materialmen's lien shall at any time be filed against any part of the Demised Premises, Lessee shall within 60 days after the notice of the filing thereof cause the same to be discharged of record by payment, deposit, bond, order of a court of competent jurisdiction or otherwise. Lessee shall defend on behalf of Lessor and at Lessee's own cost and expense any action which may be brought for the enforcement of any such liens, and Lessee shall pay any damages and discharge any judgment entered thereon and indemnify and save Lessor and any Fee Mortgagee harmless from and against any claim or damage resulting therefrom. In the event any mechanic, laborer or materialman shall send a notice of lien to Lessor, and not to Lessee, Lessor shall forward a copy of such notice of lien to Lessee, and the foregoing 60-day period shall commence as of the date Lessee receives such notice.

(C)    Anything to the contrary in the foregoing notwithstanding, Lessee shall not be required to pay, discharge or remove any mechanic's, laborer's or materialman's lien filed against the Demised Premises, or any part thereof, so long as Lessee shall in good faith proceed to contest the same, or the validity thereof, by appropriate legal proceedings, which shall operate to prevent enforcement of such lien, so long as Lessee's failure to pay, discharge or remove such lien does not result in a default under the terms of any Fee Mortgage or other agreement affecting the Demised Premises.

(D)    All materialmen, contractors, artisans, mechanics, laborers and any other persons who now or hereafter have contracted with Lessee (or any Sub lessee) for the furnishings of any labor, services, materials, supplies or equipment with respect to any portion of the Demised Premises at any time from the date of this Lease until the end

of the term of this Lease, are hereby charged with notice that they must look exclusively to Lessee (or such Sub lessee) to obtain payment for the same.

**14.    Lessor's Access to Premises**.

(A)    Subject to the terms of any Subleases, Lessee will permit Lessor and its authorized representatives upon reasonable notice to enter the Demised Premises for the purpose of inspecting the same and performing any work therein that may be necessary by reason of Lessee's failure to make any repairs or perform any work required of Lessee pursuant to the terms of this Lease. Nothing herein shall imply any duty upon the part of Lessor to do any such work, and performance thereof by Lessor shall not constitute a waiver of Lessee's default in failing to perform the same.

(B)    Lessor, upon reasonable notice, shall have the right to enter the Demised Premises for the purpose of showing the Demised Premises to prospective purchasers and for the purpose of showing same to prospective lessees.

(C)    Lessee shall not enter into any future Sublease unless such Sublease contains the following provisions:

i)    Sublessee acknowledges that the Premises is subject to that certain Lease Agreement by and between various parties as Lessor and Lessee ("**Master Lease**"), and that this Sublease shall in all respects be be subject and subordinate to the terms of the Master Lease.  No further documentation shall be required to evidence the foregoing; provided, however, that in confirmation of such subordination, Sublessee agrees to promptly execute any certificate, in recordable form, that Sublessor may reasonably request.

ii)    In the event Master Lessor shall succeed to the rights of the Sublessor, then Sublessee will recognize such party as successor Sublessor of this Sublease and shall pay the rent thereto, and perform the provisions of this Sublease for the benefit of any such successor Sublessor, and Sublessor shall concomminately recognize Sublessee under this Lease. No documentation other than this Sublease shall be necessary to evidence such attornment, and the Parties agree to execute any such documents, in recordable form, which are reasonably required by the other arties to confirm such attornment or to otherwise carry out the intent and purposes of this Section.

The requirements of this Section 14 shall not apply to the Subleases in existence as of the date of this Lease or to any amendments, modifications or supplements thereto.

**15.    Assignment**. Lessor shall have the right to assign this Lease or the leasehold estate created hereby without the consent of Lessee.  Lessee shall have the right to sublet all or any portion of the Demised Premises without the consent of Lessor,

including, without limitation, the right to enter into Subleases that extend beyond the Term of this Lease.

**16. Default**.

(A)    If any one or more of the following events (herein sometimes called "**Events of Default**") shall happen:

(i)    if Lessee shall fail to make due and punctual payment of any Fixed Rent or Additional Rent payable under this Lease or any other sum when and as the same shall become due and payable, and such failure shall continue for a period of 30 days after written notice from Lessor;

(ii)    if Lessee shall fail in the performance or compliance with any of the agreements, terms, covenants or conditions in this Lease (other than those referred to in the foregoing Section 16 (A)(i)) for a period of 30 days after written notice from Lessor to Lessee specifying the items which Lessee has failed to perform or comply with, or in the case of any failure or a contingency which cannot with due diligence be cured within said 30-day period, if Lessee fails to proceed within said 30-day period to commence to cure the same and thereafter to prosecute the curing of such failure with due diligence (it being intended in connection with a failure not susceptible of being cured with due diligence within said 30-day period that the time of Lessee within which to cure the same shall be extended for such period as may be necessary to complete the same with all due diligence);

(iii)    if Lessee shall (1) apply for, or consent in writing to, the appointment of a custodian, receiver, trustee or liquidator of Lessee or of all or substantially all of its assets, (2) file a voluntary petition in bankruptcy or admit in writing its inability to pay its debts as they become due, (3) make a general assignment for the benefit of creditors, (4) file a petition or an answer seeking a reorganization (other than a reorganization not involving the liabilities of Lessee) or an arrangement with creditors, or take advantage of any insolvency law, (5) file an answer admitting the material allegations of a petition filed against Lessee in any bankruptcy, reorganization or insolvency proceedings, (6) admit in writing its inability to pay its debts as they mature, or (7) be dissolved as the result of any adversary suit or proceedings;

(iv)    if an order, judgment or decree shall be entered by any court of competent jurisdiction approving a petition seeking a reorganization of Lessee or the appointment of a custodian, receiver, trustee or liquidator of Lessee, or of all or substantially all of Lessee's assets, and such order, judgment or decree shall continue unstayed and in effect, whether pursuant to appeal or otherwise, for any period of 90 days; or

(v)    if an involuntary case is commenced against Lessee by the filing of a petition under Chapter 7 or Chapter 11 of Title 11 of the United States

Bankruptcy Code and an order for relief is entered therein or the petition is not dismissed within 90 days after the filing of such petition;

Then and in any such event Lessor, at any time thereafter, may give written notice to Lessee specifying the Event(s) of Default and stating that this Lease and the term hereby demised shall expire and terminate on the date specified in such notice, which shall be no less than 10 days after the giving of such written notice, and upon said date this Lease and the term hereby demised and all rights of Lessee under this Lease, including any renewal privileges whether or not exercised, shall expire and terminate, and Lessee shall remain liable as hereinafter provided.

(B)    Upon any such expiration or termination of this Lease, Lessee shall quit and peacefully surrender the Demised Premises to Lessor and Lessor, upon or at any time after any such expiration or termination, may without further notice enter upon and re-enter the Demised Premises and possess and repossess itself thereof, by force, summary proceedings, ejectment or otherwise, and may dispossess Lessee and remove Lessee and (subject to the provisions of Section 16 (D)) all other persons and property from the Demised Premises and may have, hold and enjoy the Demised Premises and the right to receive all rental income of and from the same.

(C)    At any time or from time to time after any such expiration or termination, Lessor may relet the Demised Premises or any part thereof, in the name of Lessor or otherwise, for such term or terms (which may be greater or less than the period which would otherwise have constituted the balance of the term of this Lease) and on such conditions (which may include concessions or free rent) as Lessor in its uncontrolled discretion may determine and may collect and receive the rents therefor.

(D)    No failure by either party to insist upon the strict performance of any covenant, agreement, term or condition of this Lease or to exercise any right or remedy consequent upon a breach thereof, and no acceptance of full or partial rent during the continuance of any such breach, shall constitute a waiver of any such breach or of such covenant, agreement, term or condition. No covenant, agreement, term or condition of this Lease to be performed or complied with by either party and no breach thereof, shall be waived, altered or modified except by a written instrument executed by the other party. No waiver of any breach shall affect or alter this Lease but each and every covenant, agreement, term and condition of this Lease shall continue in full force and effect with respect to any other then existing or subsequent breach thereof.

(E)    Each right and remedy of the parties provided for in this Lease shall be cumulative and shall be in addition to every other right or remedy provided for in this Lease or now or hereafter existing at law or in equity or by statute or otherwise. The exercise or beginning of the exercise by either party of any one or more of the rights or remedies provided for in this Lease or now or hereafter existing at law or in equity or by statute or otherwise shall not preclude the simultaneous or later exercise by such party of any or all other rights or remedies provided for in this Lease or now or hereafter existing at law or in equity or by statute or otherwise.

(H)    Upon an Event of Default by Lessor hereunder, Lessee shall be entitled to recover against Lessor all of its reasonable costs and expenses, together with interest at the Default Rate on any sums determined to be due and payable to Lessee, in connection with any such default.

**17.    Representations by the Parties**.

(A)    Lessee accepts the Demised Premises in its "as is" condition as of the date of this Lease and agrees that Lessor shall not be required to do any work to prepare the Demised Premises for use or occupancy by Lessee. Lessor's agents have made no representations or promises with respect to the Improvements or the Demised Premises except as herein expressly set forth.

(B)    Lessor hereby represents and warrants to Lessee as follows:

(i)    Lessor has fee title to the Demised Premises, subject to no liens or encumbrances other than Permitted Exceptions. The representation contained in this Section 17(B)(i) shall be true and correct as of the Effective Date.

(ii)    Lessor, if a partnership, limited liability company, trust or corporation, is duly organized and validly existing under the laws of the state of its organization and is duly registered and qualified to do business in each jurisdiction where such registration or qualification is material to the transactions contemplated hereby and has been duly authorized by all necessary and appropriate action to enter into this Lease and to consummate the transaction contemplated herein, and the individuals executing this Lease on behalf of Lessor, have been duly authorized by all necessary and appropriate action on behalf of Lessor. Lessor, if an individual, has full power, authority and capacity to enter into this Lease and to consummate the transaction contemplated herein. When executed and delivered by Lessor, this Lease will constitute valid and legally binding obligations of Lessor, enforceable against Lessor in accordance with its terms.

(iii)    Neither the execution nor the delivery of this Lease nor the consummation of the transaction contemplated hereby nor fulfillment of or compliance with the terms and conditions of this Lease conflict with or will result in a breach of any of the terms, conditions or provisions of any agreement, order, judgment, decree, arbitration award, statute, regulation or instrument to which Lessor is a party or by which it is bound, or constitutes or will constitute a breach, violation or default under any of the foregoing.

(C)    During the term of this Lease, Lessor shall not voluntarily pursue an application for a zoning variance, land use approval, assessment, special improvement or similar action which would materially adversely affect Lessee's use of the Demised Premises or materially increases Lessee's cost to operate and maintain the Demised Premises.

(D)    Lessor hereby transfers and assigns to Lessee any and all warranties and guaranties in Lessor's possession which were obtained by Lessor (whether by specific agreement or as a matter of law) in connection with the construction or acquisition of the Improvements, and preparation of the Demised Premises, and agrees to cooperate with Lessee in connection with the enforcement of any of the foregoing. Lessor further agrees to execute any documents which Lessee may reasonably request in furtherance of the foregoing assignment.

**18.    Quiet Enjoyment**. Lessor covenants that Lessee may peaceably and quietly enjoy the Demised Premises, free from any interference, molestation or acts of Lessor or of anyone claiming by, through or under Lessor, subject, nevertheless, to the terms and conditions of this Lease.

**19.    Subordination; Subleases**.

(A)    Subject to Lessee receiving a subordination and non-disturbance agreement from any existing or future Fee Mortgagee(s) or underlying lessors, this Lease, and all the rights of Lessee hereunder, are and shall be subject and subordinate to any and all Fee Mortgages now or hereafter existing and any other liens either in whole or in part on the Demised Premises, and any extension, renewal or modification of any such Fee Mortgages, and to any and all ground or underlying leases which may now or hereafter affect the Demised Premises or any portion thereof, and any extensions, renewals or modifications thereof. In confirmation of such subordination, Lessee shall execute promptly any certificate, in recordable form, that Lessor may reasonably request.

(C)    In the event of a termination of this Lease by operation of law or otherwise, each Sublease shall continue in full force and effect as a direct lease between Lessor and Sublessee, and each Sublessee's possession of the premises leased under the applicable Sublease shall not be disturbed as a result of the termination of this Lease.

**20.    Brokerage**.  Lessor and Lessee warrant and represent that they have not dealt with any realtor, broker or agent, in connection with the negotiation of this Lease.

**21.    Lease Status**. Upon request of either party to this Lease, the other party will execute and deliver (within 10 business days after request therefor) an instrument stating, if the same be true, that this Lease is a true and exact copy of the Lease between the parties to this Lease, that there are no amendments of this Lease (or stating what amendments there may be), that the same is then in full force and effect and that, to the best of such party's knowledge, there are then no offsets, defenses or counterclaims with respect to the payment of rent reserved hereunder or in the performance of the other terms, covenants and conditions of this Lease to be performed by either party to this Lease, and that as of such date no default has been declared hereunder by either party to this Lease and that such party at the time has no knowledge of any factor or circumstance which it might reasonably believe would give rise to a default by either party.

22.    **Definition and Liability of Lessor**. The term "**Lessor**" as used in this Lease means only the owner(s) or the mortgagee(s) in possession for the time being of the Demised Premises, so that in the event of any sale of the Demised Premises or an assignment of this Lease by Lessor or such mortgagee, or a demise of the Demised Premises, Lessor (and each of the partners and principals (disclosed and undisclosed) of Lessor) shall be and hereby is entirely freed and relieved of all obligations of Lessor hereunder, provided such successor Lessor agrees in writing to assume all such obligations, whether arising prior or subsequent to the date of such assignment. In the event of any of the foregoing transfers by Lessor (or any assignee of Lessor), Lessor (or such assignee) shall deliver to Lessee a written agreement from the purchaser(s), assignee(s) or lessee(s) of Lessor's (or such assignee's) interest in this Lease or the Demised Premises, that the purchaser, assignee or lessee has assumed and agreed to observe and perform all obligations of Lessor hereunder including, without limitation, all obligations which were the responsibility of the prior Lessor hereunder, but only with respect to the period ending with a subsequent transfer of such purchaser's, assignee's, or lessee's interest in the Demised Premises.

23.    **Environmental Covenants**. Lessee hereby unconditionally covenants and agrees with Lessor, as follows:

(A)    Lessee shall not use, generate, manufacture, produce, store, release, discharge, treat, or dispose of on, under, from or about the Demised Premises or transport to or from the Demised Premises any Hazardous Substance, and shall use reasonable efforts to not allow any other person or entity to do so, except in compliance with Environmental Laws. Lessee shall not install or permit to be installed any asbestos or storage tanks at the Demised Premises and shall remedy all violations of Environmental Laws with respect thereto which arise as a direct result of Lessee's actions, including, but not limited to, removal of asbestos and/or storage tanks in the manner and as required by applicable Environmental Laws.

(B)    During the term of this Lease, Lessee shall use reasonable efforts to keep and maintain the Demised Premises in compliance with, and to not cause or permit the Demised Premises to be in violation of any Environmental Law and shall promptly take corrective action to remedy such noncompliance which arises as a direct result of Lessee's actions.

24.    **Governing Law**. This Lease shall be governed by and construed in accordance with the laws of the State of Nevada and any action arising out of or related to this agreement filed by any of the parties, their principals, or affiliates shall be filed exclusively in the courts in and for Washoe County, Nevada.

25.    **Notices.** All notices, demands, consents, approvals, and requests given by either party to the other hereunder shall be in writing and shall be sent by hand, by overnight courier, or by registered or certified mail, return receipt requested, postage prepaid, to the parties at the following addresses:

To Lessee:    Guardian Fund, LLC
              5440 Louie Lane
              Suite: 106
              Reno, NV 89511
              Tel: (775) 297-4970
              Email: Investing@hughescapital.com
              Attn: Greg Hughes

With copy to: Pino Nicholson PLLC

              99 South New York Avenue
              Winter Park, Florida 32789
              Tel: (407) 206-6511
              Email: ljp@PinoNicholsonLaw.com
              Attn: Laurence J. Pino

To Lessor:    Luster Family Trust, U.D.T. dated January 27, 2006
              3450 Davis Lane
              Reno, NV 89511

or to such other address and to the attention of such other person as either party may from time to time designate in writing. Notices shall be effective upon receipt. Refusal to accept delivery shall constitute receipt.

26.    **Assignment**. Subject to the terms and conditions of this Lease, the covenants, conditions and agreements contained in this Lease shall bind and inure to the benefit of Lessor and Lessee and their respective successors, assigns and legal representatives (including any Fee Mortgagee(s)). Lessee hereby acknowledges that Lessor shall have the absolute right to transfer 1 or more undivided interests in the Demised Premises without the consent of or notice to Lessee, in which event such transferee shall be deemed to be a "**Lessor**" hereunder. As soon as reasonably practicable after any such transfer, the transferor of such interests in the Demised Premises shall deliver a notice to Lessor and Lessee of such transfer, which notice shall reflect each Lessor's undivided percentage interest in the Demised Premises; however, the failure to deliver any such notice shall not affect Lessor's rights or Lessee's obligations hereunder.

27.    **Invalidity of Particular Provisions**. If any term or provision of this Lease or the application thereof to any persons or circumstances shall, to any extent, be invalid or unenforceable, the remainder of this Lease or the application of such term or provision to other persons or circumstances shall not be affected thereby, and each term and provision of this Lease shall be valid and be enforced to the fullest extent permitted by law.

28.     **Severability**. If any portion of this Lease shall become illegal, null or void or against public policy, for any reason, or shall be held by any court of competent jurisdiction to be illegal, null or void or against public policy (A) the remaining portions of this Lease shall not be affected thereby and shall remain in full force and effect to the fullest extent permissible by law and (B) in lieu of such invalid and unenforceable provision, there will be added automatically as a part of this Lease a provision as similar in terms to the invalid or unenforceable provision as may be possible and be valid and enforceable.

29.     **Captions**. Captions used in this Lease are inserted solely for convenience and shall not constitute a part of this Lease, nor shall they affect its meaning, construction or effect.

30.     **Surrender of the Demised Premises**. Except as otherwise herein provided, at the expiration of the term of this Lease, Lessee will peaceably yield up to Lessor the Demised Premises, broom clean, in as good order and repair as when delivered to Lessee, ordinary wear and tear and damage by the elements excepted.

31.     **Certificate of Occupancy**. Lessor agrees to cooperate with Lessee, in connection with Lessee's obtaining any certificate of occupancy which may be required.

32.     **Counterparts; Execution**. This Lease may be executed in one or more counterparts, each of which will constitute an original, and all of which together shall constitute one and the same agreement. Executed copies hereof may be delivered by facsimile, PDF or email, and, upon receipt, shall be deemed originals and binding upon the parties hereto. Without limiting or otherwise affecting the validity of executed copies hereof that have been delivered by facsimile, PDF or email, the parties will use their best efforts to deliver originals as promptly as possible after execution.

*Signature page to follow.*

IN WITNESS WHEREOF, the parties have executed this LEASE AGREEMENT as of the Effective Date.

**LESSOR(S)**

Luster Family Trust, U.D.T. dated January 27, 2006

Eric Luster

**Title:**

**Signature:**   *Eric Luster*
329F4D0CC4CE4FE...

**Date Signed:**   11/22/2021 | 5:01:54 PM PST

Luster Family Trust, U.D.T. dated January 27, 2006

Debra Luster

**Title:**

**Signature:**   *Debra Luster*
329F4D0CC4CE4FE...

**Date Signed:**   11/22/2021 | 5:00:43 PM PST

**LESSEE**

**Steve Sixberry or Greg Hughes**

**Guardian Fund, LLC**

**Title:**   Managing Member

**Signature:**   *Steve Sixberry*

**Date Signed:**   November 22nd, 2021

# EXHIBIT 2

# PROMISSORY NOTE
## *FIXED RATE LOAN*

Dated for Reference Purposes: November 22, 2021

FOR VALUE RECEIVED, at the times hereinafter stated, the undersigned, Luster Family Trust, U.D.T. dated January 27, 2006
("Borrower"), promises to pay to the order of **Guardian Fund, LLC**, a Nevada limited liability company together with its successors and assigns ("Lender") the principal sum of **($ 524,657.00              )**, or so much thereof as may be advanced (the "Loan"), with interest thereon, all subject to the terms and conditions set forth herein.

This Note and associated Deed of Trust/ Mortgage of even date encumbering certain real property, are hereinafter collectively referred to as the "Loan Documents."

1.  **SIMPLE INTEREST**
    Except as otherwise expressly provided in this Note, "Simple Interest" shall be due on the entire principal amount from the Loan Funding Date, defined as the Date the Borrower receives benefit of the loan proceeds, and thereafter on the unpaid principal balance outstanding hereunder through the date that all indebtedness and other amounts evidenced by, or payable under.

2.  **PAYMENTS**
    a.  Regular Interest Payments.  Monthly interest only payments of **$ 931.11              ** shall be due and payable on the first (1st) day of each calendar month.  Interest is calculated on a 360-day year basis on the outstanding principal balance for the actual number of days elapsed.
    b.  Repayment.   Borrower may repay this note by recording Deed Ownership of the Property(s) to Lender.  The principal amount of this note shall be reduced by each such recordation in the amount stated on the Purchase and Sale Agreement (PSA) of the even date.  Shall all properties listed on the PSA be recorded into the name of the Lender, this Note and the associated Deed of Trust/ Mortgage shall be considered fulfilled, null and void.
    c.  Notwithstanding the foregoing, all indebtedness evidenced by the Note, as herein modified, shall become due upon any acceleration of this Note pursuant a Default as set forth in this Note.

3.  **PREPAYMENTS**
    Borrower may prepay all or any part of the outstanding principal balance of this Note at any time, which prepayment shall be without any prepayment premium, fee, or other charge.

4.  **LATE CHARGES**
    Borrower recognizes that Default in making the payments when due hereunder will result in Lender incurring additional expense in servicing the Loan and in loss to Lender of the use of the money due. Borrower agrees that if, for any reason, any installment of interest shall not be received by Lender within ten (10) calendar days after the date such installment is due, Lender shall be entitled to damages for the detriment caused thereby. Borrower therefore agrees to pay Lender a late charge of ten percent (10%) of such installment or the maximum amount allowed by law, whichever is less, such late charge to be immediately due and payable without notice or demand by Lender. Borrower will pay this late charge only once for each late payment.

5.  **DEFAULT AND REMEDIES**
    a.  There shall be a "Default" under this Note if any installment of interest shall not be received by Lender within thirty (30) calendar days after the date such installment is due.  Upon a Default the entire principal amount outstanding hereunder and accrued interest thereon, together with

Lender's costs and attorneys' fees incurred in collecting and/or enforcing payment hereof shall, at once become due and payable.

b. Lender may exercise any right or remedy under this Note during any Default by Borrower regardless of any prior forbearance. The rights, powers and remedies of Lender permitted by law or contract shall be cumulative and concurrent, and may be pursued singly, successively or together against Borrower, in such order as Lender may determine, in the sole discretion of Lender, and such rights, powers and remedies shall not be exhausted by any exercise thereof but may be exercised as often as occasion therefore shall occur. Additionally, the failure to exercise any such rights, powers and remedies or the acceptance by Lender of any payment hereunder which is less than payment in full shall not constitute a waiver of the right to exercise any of Lender's rights, powers or remedies at that time or any subsequent time. Lender shall not be prohibited from exercising its right to accelerate the repayment of this Note at any time during the continuing of a Default.

**6. TREATMENT OF PAYMENTS**

Each payment under this Note shall be applied in the following order of priority: (i) first, to any costs or expenses for which Borrower is liable hereunder, including any unpaid late charges and any reimbursement of costs and expenses incurred by Lender; (ii) second, to accrued and unpaid Regular Interest; and (iii) third, to unpaid principal.

**7. EFFECT OF NOTE**

It is the intention of Lender and Borrower that this Note shall remain in full force and effect until all obligations of Borrower to Lender under this Note have been fully satisfied.

**8. MISCELLANEOUS**

a. Interpretation. In this Note, the singular shall include the plural.

b. Governing Law. This Note and the rights, duties and liabilities of the parties hereunder and/or arising from or relating in any way to the indebtedness evidenced by this Note or the transaction of which such indebtedness is a part shall be governed by and construed and enforced pursuant to the internal laws of the State of Nevada without resort to choice of law principles.

c. No Waiver. This Note and the provisions herein may not be waived, amended, modified, changed, terminated or discharged orally, but only by an instrument in writing signed by the party against whom enforcement of any waiver, amendment, modification, change, termination or discharge is sought.

d. Severability. The terms and provisions of this Note are severable. Any provision of this Note which shall be held by a court to be invalid, void or illegal shall in no way affect, impair or invalidate any other provision or term hereof, and such other provisions or terms shall remain in full force and effect.

e. Successors and Assigns. This Note shall be binding upon and inure to the benefit of Borrower and Lender and their respective successors and assigns, except that Borrower may not assign its rights hereunder or any interest herein without the prior written consent of Lender, which consent Lender may withhold in its sole and absolute discretion. Lender shall have the right, in its sole and absolute discretion and without notice to or consent by Borrower, to assign to one or more affiliates, subsidiaries or third parties all or any part of, or may grant participations to one or more affiliates, subsidiaries, or third parties in or to all or any part of this Note, and to the extent of any such assignment or participation (unless and to the extent otherwise stated therein) the assignee or participant of such assignment or participation shall have the same rights and benefits hereunder, as it would have if it were Lender hereunder.

**9. Disputes and Arbitration**

a.      If a dispute arises out of or relates to this Agreement or its breach, the parties agree to first try in good faith to settle the dispute by voluntary non-binding mediation before resorting to arbitration. The fees of the mediator will be shared equally between all parties. If a party agrees and later refuses mediation, that party will not be entitled to recover prevailing party attorney fees in any subsequent action.

b.      You are agreeing to have any dispute arising decided by neutral arbitration as provided by Nevada law and you are giving up any rights you might possess to have the dispute litigated in a court or jury trial. You are giving up your judicial rights to discovery and appeal. If you refuse to submit to arbitration after agreeing to this provision you may be compelled to arbitrate under the authority of Chapter 38, Nevada Revised Statutes. Your agreement to this arbitration provision is voluntary. You understand the foregoing and agree to submit disputes to neutral arbitration. In any action, arbitration or other proceeding involving a dispute arising out of the execution of this Agreement, the prevailing party will be entitled to receive from the other party a reasonable attorney fee, expert witness fees, and costs to be determined by the arbitrator(s). The parties shall resolve any claim or dispute arising out of this contract by mediation in accordance with the American Arbitration Association rules currently in effect. Request for mediation must be filed in writing to the other party to the contract and with the American Arbitration Association. The parties must pay the mediator's fee and any filing fees equally. The mediation shall be held in Reno, Nevada unless any other location is mutually agreed upon. Claims not resolved by mediation shall be determined by arbitration conducted pursuant to the rules of the American Arbitration Association. The award rendered by the Arbitrator in final and binding upon the parties and judgment may be entered upon it in any court having jurisdiction over the controversy. All demands for arbitration must be made within a reasonable time, but in no event after the date when institution of legal or equitable proceedings based on the claim would be barred by the applicable statute of limitation.

Signatures on following page.

IN WITNESS, HEREOF, the parties have caused this Agreement to be executed as of the date first above written by their duly authorized officers.

**BUYER**

Luster Family Trust, U.D.T. dated January 27, 2006

Eric Luster

**Title:**

**Signature:** *Eric Luster*
329F4D0CC4CE4FE...

**Date Signed:** 11/22/2021 | 5:01:54 PM PST

Luster Family Trust, U.D.T. dated January 27, 2006

Debra Luster

**Title:**

**Signature:** *Debra Luster*
329F4D0CC4CE4FE...

**Date Signed:** 11/22/2021 | 5:00:43 PM PST

**SELLER**

**Steve Sixberry**

**Guardian Fund, LLC**

**Title:** Managing Member

**Signature:** *Steve Sixberry*

**Date Signed:** November 22nd, 2021

# PROMISSORY NOTE
# EXHIBIT A

| # | Address | City | State | Zip | County | Type | Sales Price | Internal Loan Amount |
|---|---------|------|-------|-----|--------|------|-------------|----------------------|
| 1 | 1843 Charles Road | East Cleveland | Ohio | 44112 | Cuyahoga | SFR | $100,581.00 | $31,530.98 |
| 2 | 7511 Guthrie Avenue | Cleveland | Ohio | 44102 | Cuyahoga | SFR | $87,997.00 | $27,586.04 |
| 3 | 663 E 94th Street | Cleveland | Ohio | 44108 | Cuyahoga | Duplex | $136,307.00 | $42,730.66 |
| 4 | 6809-6811 Whitney Avenue | Cleveland | Ohio | 44103 | Cuyahoga | Four Plex | $199,772.00 | $62,626.20 |
| | | | | | | TOTAL SALES PRICE: | $524,657.00 | $164,473.88 |